ROBINSON, The (HARRIS v.). See Case No. 6,128.

ROBINSON (HAZARD v.). See Case No. 6,281.

## Case No. 11,954.

### ROBINSON v. HINCKLEY.

[2 Paine, 457.] [1]

Circuit Court, S. D. New York.[2]

SHIPPING—MASTER—WAGES—CHANGE OF VOYAGE—INSTRUCTIONS—FORFEITURE—ACCOUNT OF RECEIPTS AND EXPENDITURES.

1. If the master of a vessel, contrary to his instructions, change his voyage, he will incur a forfeiture of his wages.

2. Before the master is entitled to the payment of his wages, it is incumbent on him to render a full and satisfactory account of the moneys received and of the disbursements and expenditures of the ship during the voyage.

3. Where the master of a vessel, in violation of his instructions, deviated from his voyage, but the charter party for the deviation was entered into through the agency of the correspondent of the ship-owner, and evidence as to misconduct and negligence on the part of the master was contradictory, it was *held* that he had not forfeited his wages; but as the master had rendered no account of moneys received and paid out during the voyage, a decree of the district court, allowing wages, was reversed without prejudice and without costs: thereby giving to the master an opportunity of filing another libel, and rendering a full account of his receipts and expenditures.

[1] [Reported by Elijah Paine, Jr., Esq.]

[2] [Date not given. 2 Paine includes cases from 1827 to 1840.]

[Appeal from the district court of the United States for the Southern district of New York.]

The libellant filed his libel for wages, as master of the ship Majestic, at the rate of $60 per month, as stated in the libel. He alleged that the voyage was from New York to Antwerp, and thence to such other ports as might be deemed expedient; that he sailed for Antwerp; that owing to the ice they were forced to put into Cowes, and there remained until by the thawing of the ice they were able to reach Antwerp; that he proceeded thence with the ship to the port of Bristol, where she took in her loading and returned to New York; and averred that during the whole time he well and truly performed his duty.

The answer stated that libellant shipped as master of the ship Majestic, some time in December, 1837, and sailed under a letter of instructions. Alleged that he proceeded from Antwerp to Newport in Wales, and not to Bristol, as directed; denied that he well and truly performed his duty; averred misconduct, drunkenness and negligence. The letter of instructions bore date December 26th, 1837, directing the master to proceed to the port of Antwerp, and address himself to Brothers & Co., and ascertain the prospect of a return freight from Antwerp to New York, and if obtained, to return immediately to New York; and if none offered, ascertain if any offered from Newcastle or London, and if none, then to proceed at once to Cadiz, and address himself to Lacaur & Echewhake, who would load him with salt, &c. And then the answer charged, that contrary to his instructions he entered into an agreement to proceed to Newport, in Wales, and take in a cargo of railroad iron for New York—a heavy and dangerous cargo; that the ship's tonnage was two hundred and ninety-eight tons, and she took on board 535 tons, which overloaded the vessel; that having sailed with this cargo, she was, about the 22d June, 1838, obliged to put back to Bristol, where she took out her cargo and underwent a general repair, at an expense of about $6,000, occasioning great delay; that this delay and injury were occasioned by the bad habits and misconduct of the master. The answer also set out an account with the ship showing a balance against the ship of $23,915, occasioned by the ignorance, bad habits and neglect of the libellant; and charged that the libellant at various places received divers sums of money, about £300, which he had not credited; that the accounts were confused, and that no vouchers had been furnished.

THOMPSON, Circuit Justice. The voyage in this case was certainly a very disastrous one to the ship-owner, and clearly with respect to many things the respondent does not entirely exonerate himself from blame. There is pretty strong evidence to show his

habits of intoxication occasioned negligence and delay, attended with injurious consequences. But all grounds of complaint on this account have been waived on the argument. The three principal grounds of complaint which are set up on the part of the respondent against the claims for wages, are: 1. Disobedience of orders in not pursuing the voyage directed by the letter of instructions. 2. Overloading the vessel. 3. In not rendering an account of the moneys received.

1st. By his letter of instructions he was directed to proceed to Antwerp and discharge his cargo, and if any return freight offered at that port, to take it in and return to New York. If none offered there, then to make inquiry if any could be obtained at London or Newcastle; and if not, then to proceed direct to Cadiz and address himself to the correspondent of the ship-owner there, and take in a cargo of salt, and return to New York. But instead of pursuing these instructions, the master, whilst at Antwerp, chartered the vessel for a voyage from Newport, in Wales, to take a cargo of iron for New York. If the master had thus changed his voyage and departed so much from his instructions, without acting under the advice and sanction of the respondent's correspondents, I should incline to think it would have been such a violation of his orders that it would have incurred a forfeiture of his wages. But the charter party was entered into through the agency of the correspondents of the ship-owner, which affords reasonable ground to conclude that it was thought, under all circumstances, to be best for the interest of the ship-owner.[3] The evidence is somewhat at variance as to the overloading of the vessel, and the injury she sustained; and being obliged to put back to Bristol and repair, and then leaving there fifty tons of her cargo, are circumstances corroborating the opinion of those witnesses who considered her overloaded. The tonnage of the ship, by measurement, was two

---

[3] As to what acts of the owner will ratify a deviation, was discussed at some length in Codwise v. Hacker, 1 Caines, 526:

THOMPSON, J. This was an action on the case brought by the plaintiffs against the defendant, who was captain of a ship in their employ, for breach of orders. On the part of the defendant it was alleged that the instructions vested some discretionary powers in him; but that admitting he had violated his instructions, still the plaintiffs have by their conduct adopted his acts and thereby waived all claim to compensation. The general principles of law, as applicable to cases of this description, are not controverted. There can be no doubt but that a captain is responsible in damages to his owners for disobedience of orders; and there can be as little doubt but that the owners may adopt such acts as would be deemed a violation of instructions, and thereby waive all claim to damages on that account. The great difficulty arises in the application of the law to the case before us. The original instructions of the plaintiffs are very particular, and seem not to give any great latitude to the exercise of discretion. They say. "It is our desire that you strictly adhere to the following instructions, which are to be considered as binding on you, and not to be deviated from." They then proceed to point out the voyage, and the conduct to be observed by the captain. It appears to me. clearly, that the defendant's returning to New Orleans from the Havana, instead of coming to New York, was a breach of orders. But the most important question appears to be, whether there has not been a waiver by the plaintiffs of their claim for damages. The circumstances relied on by the defendant, to show that his acts have been adopted by the plaintiffs, are various. Their force and importance will depend much on an accurate attention to dates. I would, in the first place, observe that there is no pretence but that the defendant acted in good faith, and in a manner, as he supposed, best calculated to promote the interest of the plaintiffs. The great confidence which they uniformly, in all their letters, avow to repose in him, even after a breach of the orders, as appearing in the case, affords a strong presumption that the defendant, at least, if not the plaintiffs themselves, supposed he had some discretion left him as to the employment of the ship. These considerations ought to induce us to give the most favorable construction to his acts. The defendant, by letter of the 25th of November, 1799, when at sea, on the voyage from New Orleans to the Havana, informs the plaintiffs, "that if, on his arrival at the Havana, he finds no advice from them, he intended to go to Campeachy, if he could get permission: if he could not, he should run down to New Orleans for a freight home." This communication is unaccountable, if the defendant supposed no discretion left him, and that he was bound by the strict letter of his instructions. He probably placed great reliance on that part of his orders which expressed so much confidence in him, and declares that the chief dependence was placed on his exertions. It does not appear that the defendant received any advice whatever from the plaintiffs while at the Havana the first time. Their letter directed to him at that place, bears date the 28th day of November, 1799, the very day he arrived there, and there is no evidence that he received it before he left that place, which was on the 29th of the ensuing month, on his voyage back to New Orleans. It does not appear that any freight offered for the United States, or that the captain sought for any. The plaintiffs, by letter, dated the 2d of January, 1800, acknowledge the receipt of the information from the captain that he proposed going to Campeachy or returning to New Orleans, and they greatly lament such determination, on account of the high premiums of insurance on that voyage, but say nothing about his having broken his orders. Again, by letter of the 29th of January, 1800, the plaintiffs complain much of the defendant for not writing oftener, and advising them of his situation, so that they might keep the ship and cargo covered by insurance. This letter, which may emphatically be styled a letter of complaint, is so far from containing any suggestion of a violation of orders, that it expressly declares, "All the fault we find (and which is a great one) is your omission and neglect of writing us by every opportunity." When this letter was written, the plaintiffs had full knowledge of the situation of the ship: they well knew that the defendant was pursuing a different line of conduct than the one they had marked out for him; still they found no fault with this: the only complaint was, that he did not keep them advised of his situation, so that they might secure themselves by insurance. And by the testimony of Mr. Bloodgood, it appears that, in the month of February, 1800, and after the plaintiffs knew of the defendant's intention of going from the Havana to New Orleans a second time, Mr. Ludlow, one of the plaintiffs, declared that Captain Hacker was an honest man, and that he believed he did the

hundred and ninety-eight tons, and she took on board five hundred and thirty-five or forty tons of iron—and her repairs cost upwards of $6,000. Although these circumstances strongly fortify the charge of misconduct on the part of her master, I should not, however, be disposed to disturb the decree of the district court on these grounds. But I cannot satisfy myself that injustice has not been done by the master in not accounting for the advances he has received on account of the ship-owner. The accounts, as exhibited on the hearing, are so irregular, and unaccompanied by vouchers, that to allow the master to receive the full amount of his wages, ($556.86,) with interest, without requir-

best for their interest, and the only fault he found was his not writing. He made no complaint of disobedience of orders. These acts and declarations, I think, afford an irresistible conclusion, that the plaintiffs intended to adopt all the acts of the defendant of which they were apprized the beginning of February, 1800. These acts included the voyage from the Havana to New Orleans. It remains to be examined whether the plaintiffs have, by any subsequent conduct, adopted the acts of the defendant after that time. It appears by the defendant's letter, dated at New Orleans the 23d of February, 1800, he had received the plaintiff's letter, dated the 2d of January, 1800, wherein they gave him positive orders to come immediately home with the ship. But by the same letter he apprizes them that he had previously purchased a cargo on their account, from which he could not retract, which made it necessary for him to proceed on the same route he went before. And by another letter of April the 19th, he apprizes them of his arrival at the Havana a second time. After this we find the plaintiffs insuring this ship and cargo, as their own, on the voyage from the Havana to New York. On her arrival at New York, they took possession of her, sold the cargo, received the proceeds, and treated them in every respect as their own. This conduct, it appears to me, is conclusive to show that they considered the reasons assigned by the defendant for going to the Havana a second time, as sufficient; and that they intended to adopt his acts. In the Case of Smith v. Cologan, 2 Durn. & E. [2 Term R.] 188, in a note, it was decided by Buller, J., that where a principal, with knowledge of all the circumstances, adopts the acts of his agent for a moment, he ought to be bound by them. So, also, in the case of Cornwal v. Wilson, 1 Ves. Sr. 509, where a factor in the purchase of goods had exceeded the price limited, yet the principal received the goods, and disposed of them as his own; and it was held that this was an adoption of the factor's act, notwithstanding the principal, by a letter, had expressly disavowed receiving the goods on his own account. Lord Chancellor Hardwicke declares the principal concluded by his own acts; by taking the goods to himself and treating them as his own; and that these acts being subsequent to the letter disaffirming the contract, explained the nature of the whole transaction, and the intent with which he acted.

KENT, J. There can be no doubt, I think, but that the defendant was guilty of a breach of orders, in returning to New Orleans from the Havana. Here the deviation from his instructions commenced, and the only question is, whether the plaintiffs have, by their acts and declarations, ratified his conduct, and precluded themselves from the present suit. The rule is, that if, with a knowledge of all its circumstances, a principal adopts the acts of his agent, he is bound by them. 2 Durn. & E. [2 Term R.] by Buller, J.; 1 Ves. Sr. 509. This principle was recognized by this court, in the case of Towle v. Stevenson, 1 Johns. Cas. 110, decided in October term, 1799. In that case, the defendant received a bill of exchange to collect for the plaintiffs; and to enable the endorser to secure himself, he surrendered it up to the endorser, without receiving the money, and, consequently, made himself liable. This fact was afterwards disclosed by him to the plaintiffs, who, without any express discharge to him, or ratification of his act, assumed the business of pressing the endorser for payment. The endorser failed, and this assumption of the business, after a full disclosure had been made, was held to exonerate the defendant. The defendant, in the present case, seems not to be liable to the charge of any intentional wrong. Although the great outline of the voyage was prescribed to him, he was, in every other respect, left with large discretionary powers. It is admitted, as not liable to dispute, that an explicit approbation of the conduct of the defendant would be a waiver of any remedy on the part of the plaintiffs; and are not the circumstances in this case equivalent to such approbation? When a factor is entrusted with large power, requiring the exercise of much sound judgment, and he acts with an honest, though misguided zeal, for the interest of his principal, it is just and politic to construe the acts of the principal pretty liberally in favor of an adoption of those of the agent. After the plaintiffs had full knowledge of the defendant's second voyage to New Orleans, they insure, on their own account, the cargo and freight of such second voyage, and of the subsequent voyages back to the Havana and to New York. They receive, sell and take to themselves the proceeds of the molasses, which were an investment by the defendant at the Havana of what was to be traced back, as the result of part of the freight of the first voyage from New Orleans to the Havana, and which molasses the defendant had shipped to the plaintiffs as for their account. They declare by letter to the defendant, that they have full confidence he would use his best endeavor to promote their interest, and that they find no fault with him, except in his neglect in not writing to them, and they declared the same to other persons. These acts and declarations amount to something more than an equivocal adoption of the defendant's acts, they are a clear and intelligible approbation. The molasses were the result of a conversion by the defendant of the freight, and yet the plaintiffs accept the molasses, as shipped on their account, and sell them as their own. During all these acts, there is not a disavowal in any shape of the defendant's conduct. In the case of Cornwal v. Wilson, 1 Ves. Sr. 509, the factor, in the purchase of hemp, exceeded his limited price. The principal, by word, refused the contract, as he had a right to do, but he still took the goods to himself. He acted with them as his own; sold them as his own, and not as factor for his factor. Lord Hardwicke held that notwithstanding what he said, he meant to take them as his own, and decreed accordingly, that the principal was bound by the price given. The present case is certainly as strong for the defendant, and I am of opinion that the plaintiffs have sufficiently sanctioned the defendant's departure from his instructions, and are not entitled to recover against him on that ground.

LEWIS, C. J. The plaintiffs, as owners, prosecute the defendant for breach of orders, as master of their ship Young Eagle. The defendant has committed a breach of those orders, and for this he is liable in damages, unless justified by the peculiar circumstances of his situation, or discharged by the subsequent conduct of the plaintiffs. The state of the ship created no impediment. She was completely repaired at New Orleans on her first arrival there. The

ing from him a full and satisfactory account of the moneys received, and of the disbursements and expenditures of the ship during the voyage, would not only be doing injustice to the respondents, but would be sanctioning a laxity of conduct on the part of the master, in matters entirely within his own control and duty, that would be unsound in principle and injurious in practice. But to guard against any injustice being done to the master, I shall reverse the decree of the district court, and dismiss the libel without prejudice, and without costs on either side; thereby giving to the libellant an opportunity of filing another libel, and rendering a full account of his receipts and expenditures.

See The Grand Turk [Case No. 5,683]; The Mary [Id. 9,186]; Murray v. Lazarus [Id. 9,-962].

---

season of the year was a fact known to the owners at the time they gave the instructions. The want of freight and convoy cannot form a justification, as they were not events by which the conduct of the voyage was to be influenced. For a discharge, on the ground of the plaintiffs' having adopted his acts, the defendant relies on certain conversations between Mr. Ludlow and Mr. Bloodgood, the letter of the plaintiffs of the 29th of January, 1800, their procuring insurance on the unauthorized voyages, and their receiving and selling the cargo of molasses he brought from Havana to New York. The substance of these conversations was, that Mr. Ludlow believed Mr. Hacker an honest man; that he did the best for their interest; and that the only fault he found was his not writing. When these conversations took place does not precisely appear, further than that one was about the 6th of February, 1800, the other in the spring of that year. The letter of the 29th of January is to nearly the same effect; containing a declaration that all the fault they found was the defendant's omitting to write to them. It must be remembered that at the time of these conversations, and of writing the letter of the 29th of January, it does not appear that the plaintiffs knew of his having actually committed a breach of orders. They only knew he contemplated it when at sea on the 25th of November, in the event of his not meeting at Havana with advice from them. This cannot, then, be construed into an approbation of conduct, of which they probably were ignorant. But were it otherwise, the approbation relied on to excuse mal-conduct, where by parol merely, ought to be unequivocal and explicit; and a mere declaration of a belief in the honesty and integrity of the defendant, and a refusal to complain of his conduct, cannot be sufficient. Many an honest man has committed errors which have rendered him liable in damages, and many an injured one has refused to complain. The acts of the plaintiffs remain to be considered. Their procuring insurance on the unauthorized voyages, and their receiving and selling the molasses. I can discover no principle on which either of these acts can be construed into an adoption of the conduct of the defendant. It would be a regulation ruinous to commerce, if whenever a portion of a merchant's property is sacrificed by the unauthorized acts of the master of his ship or consignee, that he should be obliged to jeopardize the remainder, before he shall be entitled to a recovery in damages. In the present instance, the owners' property, in neither the vessel, her cargo, nor her earnings, was in anywise changed by the conduct of her master. They were, therefore, perfectly correct in what they did, and their right to recover remains unimpaired.